***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. Plaintiff alleges to have contracted a compensable occupational disease on or about 29 August 2001.
5. An employment relationship existed between Plaintiff and the Defendant-Employer on or about 29 August 2001.
6. Plaintiff's average weekly wage is $586.05.
7. The parties further stipulated to the following: (a) Plaintiff's medical records regarding this claim; (b) a videotape, although the parties did not stipulate as to the accuracy of the videotape; and (c) while Dr. Perlik did not testify, the parties stipulate that Dr. Perlik would testify in accordance with his report of 26 June 2002.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of hearing before the deputy commissioner, Plaintiff was fifty years old, with a date of birth of 27 December 1951. She has a ninth-grade education with no other formal education or training. Plaintiff's employment has always been in manufacturing. Before becoming employed with Defendant-Employer, Plaintiff worked at Executive Furniture for five years as a leather cutter. Plaintiff began working for Defendant-Employer, a furniture manufacturer, in 1996 as a leather cutter. She is one of three to four employees at Defendant-Employer's plant who cuts leather for furniture manufacturing.
2. Plaintiff's job duties as a leather cutter included taking large leather hides and cutting them into pieces for furniture. Plaintiff used a leather cutter tool powered by air, not electricity, to cut the leather. There were two ways to use the cutter: (1) by pressing the thumb against the trigger on top of the tool; or (2) by squeezing the cutter with the fingers when the lever is on the bottom. Because Plaintiff had to apply more pressure to operate the cutter with her fingers, she testified that she adjusted her cutter and began to use her thumb to trigger the lever after her symptoms began and another employee advised her that the thumb trigger was less strenuous. Most of the cutters working for Defendant-Employer used their fingers to operate the air-powered cutters. While operating the air tool, Plaintiff bent her wrist inward in a flexed position and rotated it back and forth while cutting the leather. Depending on the pattern, Plaintiff would sometimes turn her wrist upside down to cut the leather hide. For smaller pieces, Plaintiff had to cut with her thumb pointing upward and while applying pressure to the cutter until her thumb was pointing down toward the table. The air cutter vibrated continuously while it was on. After Plaintiff cut the leather hides into pieces, she put them in a stack, tied them into a bundle and set the bundle aside.
3. Approximately 80% to 90% of Plaintiff's time during the weekday was spent operating the hand cutter to cut patterns out of leather hides usually measuring 49 x 70 feet. The leather hides were already pre-marked with the patterns on them. Plaintiff normally worked on 50 to 75 hides per day. Plaintiff worked at a kidney-shaped table that was adjustable to tilt toward her as she worked. Plaintiff was paid based upon how much production she accomplished. Consequently, she worked as fast as possible so that she would be paid more. Plaintiff did not know how many pieces she put out per week and did not testify as to how much she was paid per piece.
4. In late 2000, Plaintiff began experiencing tingling and numbness in her fingers and pain in her thumb, which radiated to her wrist and elbow while working. When Plaintiff was off for holiday vacation, her symptoms were not nearly as bad.
5. In September 2000, Plaintiff presented to Dr. Reginald Moore complaining of neck and bilateral arm pain. On 13 October 2000, Plaintiff continued to complain of neck pain. Dr. Moore ordered nerve conductions studies, which revealed carpal tunnel syndrome in Plaintiff's right upper extremity. At the time, Plaintiff did not complain of symptoms in her left upper extremity. Dr. Moore referred Plaintiff to Dr. Mark R. McGinnis, a board-certified orthopedic surgeon and hand specialist.
6. Plaintiff presented to Dr. McGinnis on 20 December 2000 and 3 January 2001. On those dates, Plaintiff complained of pain, tingling and numbness in her right hand and wrist. A physical examination revealed weakness in the muscles leading to the thumb, a positive Tinel's sign and a positive Phalen's test, which were consistent with a diagnosis of carpal tunnel syndrome. Nerve conduction studies revealed a moderate median neuropathy in Plaintiff's right hand and a mild median neuropathy in Plaintiff's left hand. At Plaintiff's 20 December 2000 visit, Dr. McGinnis recommended a steroid injection to decrease swelling in Plaintiff's flexor tendons. Plaintiff reported improvement after the injection. On 3 January 2001, Dr. McGinnis's impression was bilateral carpal tunnel syndrome with the right being worse than the left.
7. Subsequently, Dr. McGinnis ordered a cervical MRI, which revealed a normal cervical spine. This ruled out any spinal pathologies. On 15 August 2001, Dr. McGinnis stated in his medical notes that Plaintiff's employment contributed to or exacerbated her carpal tunnel syndrome because it is strenuous and significantly repetitive. He also stated that Plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome. On 29 August 2001, Plaintiff informed Dr. McGinnis that she wanted a carpal tunnel release.
8. Dr. McGinnis performed a right carpal tunnel release on 22 September 2001. On 1 October 2001, Plaintiff reported decreased pain and paresthesias. A medical note dated 1 October 2001 indicated that Plaintiff was not to use her right hand, but to return to work. Dr. McGinnis estimated that Plaintiff would be able to return to work without restrictions by 15 November 2001. Plaintiff was taken out of her splint on 15 October 2001.
9. On 7 November 2001, Plaintiff reported vague muscular pain in her right proximal forearm and distal arm that may have been secondary to returning to the active use of her right arm at home. Dr. McGinnis continued the following restrictions: limited use of the right hand with no lifting over 10 pounds, limited pushing, pulling, grasping and limited repetitive movements for 3 weeks. On 28 November 2001, Plaintiff indicated that she would like to return to work full duty. Dr. McGinnis recommended that Plaintiff try to return to work full duty by 3 December 2001.
10. Plaintiff returned to full duty work on 3 December 2001. By 9 January 2002, Plaintiff began experiencing vague discomfort throughout her right hand and forearm. Dr. McGinnis then changed Plaintiff's restrictions to no manual leather cutting with her right hand. Defendant-Employer provided Plaintiff with a laser-cutting machine instead of the manual, air-powered cutting tool. Subsequently, due to complaints of pain, Plaintiff received two steroid injections to her right deltoid and left carpal tunnel on 18 March 2002 and 3 April 2002, respectively. On 14 May 2002, Dr. McGinnis recommended a course of hand therapy. On 29 May 2002, Dr. McGinnis found Plaintiff to be at maximum medical improvement and advised her to discontinue leather cutting indefinitely. He was of the opinion that Plaintiff could operate a cutting machine and perform other light duty jobs. Plaintiff continued to use the laser-cutting machine until June 2002.
11. By July 2002, there was minimal work to be done at Defendant-Employer's plant due to a lack of available work, so the cutters and other employees worked on a rotation schedule where they would work part of the time and be laid off part of the time. As of the date of hearing before the deputy commissioner on 21 October 2002, Plaintiff was still employed but she had last worked with Defendant-Employer on 3 October 2002. From July 2002 to 3 October 2002, although she continued to experience pain in her right arm and hand when using the manual air-powered cutter, Plaintiff's diminished earnings were due to economic conditions, not her carpal tunnel syndrome.
12. Dr. McGinnis was of the opinion that Plaintiff was employable, given her physical capabilities, in light to medium category jobs and possibly in a moderately strenuous job. In response to questions about whether Plaintiff's job placed her at an increased risk of developing carpal tunnel syndrome in relation to the general public, Dr. McGinnis testified that he evaluates an increased risk as being either a minimum, moderate or severe risk of developing a problem. Dr. McGinnis further opined that based on the job duties depicted in the videotape, Plaintiff's employment placed her "possibly as a minimal increased risk of developing a problem compared with the general population." Dr. McGinnis's opinion that Plaintiff's job duties placed her at a possibly minimal increased risk was given before he was asked to assume that the tool Plaintiff used vibrated. When asked to also assume that the pneumatic cutting tool used by Plaintiff was a vibrating tool, Dr. McGinnis gave the opinion that vibration exposure poses a risk factor of developing carpal tunnel syndrome and that may be the one reason the job may place Plaintiff at a minimally increased risk of developing carpal tunnel syndrome. When asked to also assume that Plaintiff worked at a faster pace than depicted on the video, Dr. McGinnis testified that, "I don't know that it would change labeling as a minimally increased risk." Dr. McGinnis later testified that he "would still say that [the hand tool] puts [Plaintiff] at a minimally increased risk."
13. Dr. McGinnis further testified as follows:
 Q. To the extent that it is or would be your opinion that Ms. Bumgardner's work for Cibola Furniture Company was causing her carpal tunnel syndrome, caused her to develop carpal tunnel syndrome, would it be fair to say that the reason she developed the carpal tunnel syndrome while working for Cibola would have been the use of the hand tool that we watched her using on the tape?
 A. Again, I would just say that using that, knowing that there is some degree of vibration exposure, and knowing that it may weigh in the vicinity of one or two pounds that she has to hold for possibly 80 to 90% of the day, it may place her at a mild increased risk of developing carpal tunnel syndrome.
14. On the issue of whether Plaintiff's job duties caused her carpal tunnel syndrome, the following exchange took place during Dr. McGinnis's deposition:
 Q. So to the extent that her job with Cibola Furniture was causing her hand problems, her right side carpal tunnel syndrome, to the extent that's true, you would attribute it to this hand tool, is that correct?
A. As best as I could attribute it to anything, yes.
Q. And would that be to a degree of medical certainty?
 A. That would be to a degree of medical certainty, yes, which sounds somewhat of a vague statement also.
 Q. Would that be your opinion to a reasonable degree of medical certainty?
A. That would be my opinion as stated, yes.
15. The parties stipulated to a letter written by Dr. Paul C. Perlik, who did not testify, but reviewed the videotape of a leather cutter's duties and the medical notes of Dr. McGinnis. Dr. Perlik opined that there was no causal connection between Plaintiff's employment and her carpal tunnel syndrome. He also stated that he did not believe Plaintiff was placed at a greater risk of developing carpal tunnel syndrome as compared to the general public. Dr. Perlik did not examine Plaintiff nor did he speak with her. The opinions of Dr. Perlik are given less weight than those of Dr. McGinnis.
16. Based on the greater weight of the evidence, the Full Commission finds that Plaintiff's employment placed her at an increased risk of developing carpal tunnel syndrome than the general public not so employed and Plaintiff's job duties caused her right carpal tunnel syndrome.
17. As a result of her right carpal tunnel syndrome, Plaintiff was unable to work from 22 September 2001 to 3 December 2001. A permanent partial disability impairment rating has not been assigned.
18. Plaintiff's average weekly wage was $586.05, which yields a compensation rate of $390.90.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted a compensable occupational disease, right carpal tunnel syndrome, which disease is proven to be due to causes and conditions which are characteristic of and peculiar to her particular trade, occupation or employment as a leather cutter with Defendant-Employer as compared to the general public not so employed. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff has been temporarily totally disabled as the result of her occupational disease from 22 September 2001 to 3 December 2001 and is entitled to temporary total disability compensation during that time period in the amount of $390.90 per week. N.C. Gen. Stat. § 97-29.
3. Defendants are obligated to pay Plaintiff's medical expenses resulting from her compensable occupational disease for so long as such treatment may be reasonably required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay Plaintiff temporary total disability compensation at the rate of $390.90, per week from 22 September 2001 to 3 December 2001. All compensation has accrued and shall be paid in a lump sum.
2. Defendants shall pay for all medical expenses incurred or to be incurred by Plaintiff as a result of her compensable occupational disease so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen Plaintiff's period of disability.
3. Defendants shall pay a reasonable attorney fee in the amount of 25% of the compensation approved and awarded Plaintiff in paragraph one. The attorney fee shall be deducted from the compensation due Plaintiff and paid directly to Plaintiff's attorney.
4. Plaintiff's entitlement to elect compensation for permanent partial disability or partial disability, if any, is reserved for subsequent determination.
5. Defendant shall pay the costs.
This the ___ day of January 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER